IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DEBRA MCGRATH**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:15cv222 |
| | ) | **Electronic Filing** |
| **NATIONWIDE MUTUAL INSURANCE** | ) | |
| **COMPANY** and **NATIONWIDE** | ) | |
| **INSURANCE COMPANY OF** | ) | |
| **AMERICA**, | ) | |
| | ) | |
| Defendants. | ) | |

# **OPINION**

Debra McGrath ("plaintiff") commenced this action in the Court of Common Pleas of Allegheny County, Pennsylvania by filing a Writ of Summons on April 15, 2014. Plaintiff filed a complaint on January 27, 2015, setting forth claims for breach of contract, breach of the covenant of good faith and fair dealing, fraud in the inducement, misrepresentation, unjust enrichment, unlawful discrimination in the form of age discrimination, wrongful discharge, negligent infliction of emotional distress, and intentional infliction of emotional distress. Defendants removed the action on the basis of diversity jurisdiction and filed a motion to transfer pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below, the motion will be granted.

As gleaned from the allegations of the complaint and the parties' submissions in conjunction with the motion, the relevant facts are as follows. Plaintiff first became affiliated with Nationwide Mutual Insurance Company ("defendant") in July of 2005 when she began working as an associate agent for Anthony Colosimo, an authorized Nationwide insurance agent. Within a few months Mr. Colosimo learned that he had cancer, and he died in February of 2006.

Plaintiff eventual assumed all of his responsibilities during the 7 month period from August of 2005 through February of 2006.  Plaintiff was paid an hourly rate plus operating costs during this time.  Representations were made to plaintiff about her ability to purchase her own agency.

In March of 2006 another agency operation was combined into the book of business plaintiff was overseeing.  The combined book of business was a sizable operation.  Defendant offered to hire an office assistant to help plaintiff and plaintiff accepted.   Plaintiff continued to be paid an hourly rate plus operating costs.  Representations were made to plaintiff about her ability to purchase her own agency.

In May of 2006, the book of business plaintiff was overseeing (three combined agencies) was divided into two agencies and sold to two other candidates who were in defendant's "Mentee program."  Plaintiff was offered the opportunity to work for her choice of one of these two agencies for salary and benefits as opposed to commissions.  Plaintiff chose one of the agencies and went to work in June of 2006 as an associate agent and office manager for Mr. Marnic pursuant to a two year employment contract.  Based on the representations that had been made it was plaintiff's understanding that the arrangement would last only until an existing agency became available for her to purchase.  Plaintiff was assured that she was qualified to purchase an agency but simply had to wait her turn.

 While working in the Marnic agency plaintiff observed irregularities in the form of policies being rolled over to Allstate and the former operator of the Marnic agency who had left to work for Allstate.  Plaintiff reported the rollovers.  This lead to defendant providing a substantial refund to Mr. Marnic in the purchase price of his agency.

A meeting was held in December of 2006 to discuss the various concerns that had been generated from plaintiff detecting the improper rollovers.  Plaintiff, Mr. Marnic and Mr.

Montelone, a supervising employee of defendant, attended the meeting. During the meeting Mr. Montelone assaulted plaintiff. She made a the report of the incident at Mr. Marnic's insistence. Thereafter, Mr. Montelone was terminated and his supervisor, Mr. Keto, was demoted.

In January of 2007, Mr. Hohlbaugh took over for Mr. Montelone in the direct supervision position and Carol Miller took over as Assistant Vice President of Sales for the region. Ms. Miller informed plaintiff that she would still be able to purchase an agency, but she would have to work with Mr. Hohlbaugh on the matter. Mr. Hohlbaugh advised plaintiff that there were no agencies available at that time.

Mr. Santillo, a former Allstate agent, began working for defendant at a managerial level. Defendant sold an agency to a friend of Mr. Santillo's wife, Ms. Whitman. Ms. Whitman did not have former experience in running a insurance agency. Plaintiff was not given an opportunity to interview for and/or purchase the agency.

In February of 2007, Mr. Santillo informed plaintiff about defendant's Agency Capital Builder program ("ACB program"). Mr. Santillo was overseeing the program. He told plaintiff she was not required to enroll in the program in order to purchase an agency.

In March of 2007, plaintiff agreed to take a "Caliper test" which was used by defendant to determine if an individual is qualified to be an agency owner/principal agent. Defendant refused to disclose the results of the test to plaintiff over the next several months notwithstanding her repeated requests for the same.

In November of 2007, defendant sold another agency that was located in close proximity to the Marnic agency. Plaintiff was not given an opportunity to interview for and/or purchase the agency. When plaintiff inquired about the matter Mr. Hohlbaugh informed her that she had failed the Caliper test. Plaintiff believes she passed the test.

In December of 2007, Mr. Santillo informed plaintiff that she would have to enroll in the ACB program in order to be eligible to purchase an agency. This was the first time plaintiff had been told that such a requirement existed.

In April of 2008, plaintiff retook the Caliper test. Shortly thereafter defendant informed her that she passed.

A few weeks later plaintiff meet with Mr. Santillo and Ms. Miller regarding plaintiff's prospects in the ACB program and purchasing an agency. Ms. Miller stated that she did not want plaintiff in the program because of her age, but Mr. Santillo supported plaintiff's admission into the program.

In July of 2008, plaintiff and defendant entered into an "Agency Capital Builder Employment Agreement" ("ACB Agreement"). Plaintiff was the fourth agent accepted into the program at that time. Within six months three others were accepted into the program and received ACB agreements.

With the exception of one individual, all of these individuals were all in their twenties and thirties. Plaintiff was considerably older and had more experience in the insurance industry. Plaintiff was the only candidate with prior experience who was required to enroll in the ACB program in order to be eligible to purchase an agency.

The ACB program was a twenty-four month program that could be completed in as little as eighteen months if the candidate meet certain sales quotas and performance goals. At the end of the program the successful candidates were either offered an existing agency to purchase or required to start an agency from scratch, that is to build one from the ground up with no existing book of business. Entry into an "Agency Executive Program Performance Agreement" ("AEP Agreement") was required if an ACB program graduate started a scratch agency.

Plaintiff completed the ACB program in nineteen months. Mr. Santillo told her there were no agencies to purchase. Plaintiff effectively was required to pursue a scratch agency at that time. She executed an AEP Agreement in July of 2010. Two of the younger individuals who had entered the ACB program prior to plaintiff were permitted to purchase existing agencies upon completion.

Mr. Santillo reviewed the performance criteria of plaintiff's AEP Agreement with her at startup and advised that while the target numbers projected substantially increased levels after the initial two years, plaintiff would have an opportunity to purchase an existing agency before the two years of operating the scratch agency were completed. Such a purchase would displace the AEP Agreement and provide a new agreement with much more realistic and attainable goals.

During the initial time in setting up plaintiff's scratch agency defendant sold four agencies to others. Two of these individuals had not completed the "required" ACB Program and two had not even been enrolled in the program. Plaintiff was not given an opportunity to interview for and/or purchase these agencies.

Plaintiff met or exceeded the production requirements for her scratch agency during the first eighteen months of operation. Defendant changed the target numbers as the agency grew. Even with these changes plaintiff was in the top ten performers within the Pittsburgh area agencies. Plaintiff did not receive any credit for the policies she had procured during the time she worked for defendant as an associate agent.

By November of 2011, all of the individuals in the ACB Program were given the opportunity to purchase existing agencies in the surrounding area save three – plaintiff, Jamie Kerr and Robert Tyree. Mr. Hohlbaugh repeatedly told plaintiff she would be given an

opportunity to purchase an agency. He told plaintiff that there were no agencies available each time plaintiff inquired.

In December of 2011, Ms. Kerr was offered an agency. This only occurred after Ms. Kerr's husband resigned from his position as an employee and master claims adjuster for defendant and began working in Ms. Kerr's scratch agency. This marked the seventh time an individual had "jumped ahead" of plaintiff in being permitted to purchase an agency.

In March of 2012, defendant cancelled the agency of Scott Diemert, the individual who had taken over the Colosimo agency where plaintiff had first gone to work for defendant. Defendant did not offer plaintiff the opportunity to interview for and/or purchase the agency.

On July 23, 2012, defendant terminated plaintiff's scratch agency on the basis of failure to meet sales quotas. During one month in 2011 plaintiff had been second out of more than twenty area agents in net policies sold. She consistently was in the top five agents for net policies sold for every month in 2011.

Following the termination plaintiff again was re-hired to run the scratch agency at an hourly rate of $20 instead of the $6,000 to $9,000 a month she had been earning in commissions. She was required to perform the exact same work she had done while under commission.

Defendant terminated the hourly agreement when it sold plaintiff's scratch agency in December of 2012. Plaintiff was not given the opportunity to interview for and/or purchase her scratch agency. The purchaser of the agency was given sales requirement terms that were much lower than those required of plaintiff. Plaintiff was not given any consideration for her scratch agency when defendant terminated her AEP Agreement and thereafter sold her scratch agency.

Defendant seeks a transfer under § 1404(a) to the Eastern Division of Southern District of Ohio. It asserts that such a transfer is warranted based on a forum selection clause in the AEP

Agreement that plaintiff signed and the balance of the relevant § 1404(a) factors. Plaintiff opposes the motion on the grounds that (1) the clause did not survive beyond plaintiff's participation in the Agency Executive Program and defendant's termination of the agreement, (2) the clause is unenforceable due to fraud, undue influence and overweening bargaining power, and (3) the public interest factors make a § 1404(a) transfer inappropriate.

A motion to transfer under §1404(a) requires the district court to perform a case-specific analysis and to weigh all relevant factors in determining whether on balance the litigation would more conveniently proceed and the interests of justice would be better served by the requested transfer to a different forum. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). The analysis is flexible and must be guided by the facts and circumstances of the case. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249-50 (1981); Van Dusen v. Barrack, 376 U.S. 612, 623 (1964); Sandvic, Inc. v. Continental Ins. Co., 724 F. Supp. 303, 307 (D. N.J. 1998).

The moving party has the burden of submitting adequate information to justify the transfer. American Tel. & Tel. Co. v. MCI Communication Corp., 736 F. Supp. 1294, 1306-07 (D. N.J. 1990). In submitting adequate data of record to support the transfer, the moving party is required to address the relevant private and public interest factors at issue. The private interest factors include: (1) plaintiff's choice of forum, (2) ease of access to sources of proof, (3) costs involved in obtaining the attendance of willing witnesses, (4) compulsory process for unwilling witnesses, (5) practical problems that make a trial easy, expeditious and inexpensive and (6) the convenience of the parties. Public interests factors are: (1) congestion of court dockets, (2) choice of law considerations and (3) community interests in having a dispute resolved in a local forum. See Gulf Oil Corp. v. Gilbert, 303 U.S. 501, 508-09 (1947); Jumara, 55 F.3d at 879; Luca Oil Drilling Co. v. Gulf Oil Corp., 593 F. Supp. 1198, 1200 (W.D. Pa. 1984).

In considering a § 1404(a) motion to transfer, the first step is to determine whether the action "might have been brought" in the transferee forum. The transferor court must determine whether plaintiff has an unqualified right to commence the action in the transferee district and whether the transferee forum has the power to exercise personal jurisdiction over all defendants. Camasso v. Dorado Beach Hotel Corp., 689 F. Supp. 384, 386 (D. Del. 1988) (citing Hoffman v. Blaski, 363 U.S. 335, 343-44 (1960)). Plaintiff does not challenge defendant's implicit assertion that the action could have been filed in the Eastern Division of United States District Court for the Southern District of Ohio. Thus, the first step does not preclude the requested transfer.

Where the plaintiff has chosen a legally correct forum which is the forum of the plaintiff's residence, there is a strong presumption in favor of the plaintiff's choice which should not be lightly disturbed. Shutte v. Armco Steel Co., 431 F.2d 22, 25 (3d Cir. 1970), cert. denied, 401 U.S. 910 (1971). However, such deference to the plaintiff's choice of forum is not dispositive, especially when it is in contravention to the parties' privately agreed upon forum. See Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (U.S. 1988) ("The presence of a forum-selection clause such as the parties entered into in this case will be a significant factor that figures centrally in the district court's calculus."); Jumara, 55 F.3d at 880 ("Thus, while courts normally defer to a plaintiff's choice of forum, such deference is inappropriate where the plaintiff has already freely contractually chosen an appropriate venue."). Where the opponent of the forum selection clause has not established "'fraud, [undue] influence, or overweening bargaining power,' ... the [opponent] bear[s] the burden of demonstrating why [the parties] should not be bound by their contractual choice of forum." Id. (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12-13 (1972)).

Under the terms of the AEP Agreement plaintiff consented to a forum selection clause that mandated the filing of suit in Franklin County, Ohio, which is within the Eastern Division of United States District Court for the Southern District of Ohio. Section 40 of the AEP Agreement provides:

> It is hereby agreed by the parties that this Agreement shall be governed by the laws of the State of Ohio, regardless of any conflicts of law provision requiring reference to the rules of, decision in, and/or laws of another state or sovereign nation and that any action or proceeding arising from a dispute concerning the AE Program shall be brought in Franklin County, Ohio. (emphasis added).

Agency Executive Program Performance Agreement (Subsequent to ACB Program), Exhibit B to Plaintiff's Complaint (Doc. No. 1-1) at p. 49, ¶ 40. Plaintiff admits that she signed this agreement.

Plaintiff's contention that the forum selection clause did not survive defendant's termination of agreement is misplaced. Plaintiff relies on the "Survival Of Obligation" clause, which provides that "[t]he obligations of the parties under this Agreement that by their nature continue beyond the expiration of the Agreement shall survive any termination or cancellation of this Agreement." Id. at 59, ¶ 41. But the choice of law and forum selection clause provision is such an obligation. The provision is not limited to the duration of Agreement. The Agreement does not become "governed" by the laws of another state upon termination or cancellation; to the contrary, it continues to be governed by the laws of Ohio. Likewise, the forum selection clause is not limited to suits or proceedings commenced while the parties are performing the Agreement; it applies to "any action or proceeding" which arises from "a dispute concerning" the Agency Executive Program. By its literal words, the provision binds both parties to recognize that Ohio law governs the Agreement and that any suit or proceeding arising out any dispute

9

concerning the program is to be brought in Franklin County, Ohio, regardless of when it is filed or commenced.

Plaintiff's reference to the consideration clause fails to provide any support for plaintiff's cancellation theory. The consideration clause does not limit the scope of the agreement to plaintiff's participation in the program. To the contrary, the parties acknowledged that "[i]t is the intent of this Agreement to define the conditions governing the business relationship between the parties involved." Id. at Preamble, 49. The business relationship is far more encompassing than plaintiff's actual performance in the program.

In short, the assertion that the forum selection clause did not survive defendant's termination of the AEP Agreement is belied by the words the parties chose to govern their understanding on that matter and their expressed intent in entering into the Agreement. Thus, plaintiff's termination argument collapses under the very authority she advances to support it.

Plaintiff's contention that the forum selection clause is invalid and unenforceable due to fraud, undue influence or overweening bargaining power is unavailing. The United States Court of Appeals for the Third Circuit has reiterated the analysis to be undertaken where a forum selection clause is sought to be enforced in a case raising a claim of fraud. In MoneyGram Payment Systems, Inc., v. Consorcio Oriental, S.A., 65 F. App'x 844 (3d Cir. 2003), the court observed that in this jurisdiction

> a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching; (2) that enforcement would violate strong public policy of the forum; or (3) that enforcement would in the particular circumstances of the case result in jurisdiction so seriously inconvenient as to be unreasonable.

MoneyGram, 65 F. App'x at 846 (quoting Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd., 709 F.2d 190, 202 (3d Cir. 1983)).

Moreover, an allegation of fraud does not in itself render a forum selection clause unenforceable. Id. at 847 (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 (1974)). Instead, a "forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." Id. In other words, "the proper inquiry is whether the forum selection clause is the result of 'fraud in the inducement of the [forum-selection] clause itself.'" Id. (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403–04 (1967)).

Plaintiff cannot show that there was fraud in the inducement of the forum selection clause itself. Plaintiff admitted in her deposition that she did not read the AEP Agreement prior to signing it. And while she was asked to sign it upon its presentation and it was presented as a take-it-or-leave-it proposal, she did not ask for additional time to review and consider the matter, to consult with an attorney or to formulate some alternative proposal. She did not seek to raise or barter over the choice of law and forum selection clauses. She was by her own allegations a sophisticated and competent business woman. Thus, there is nothing in the record to support a showing that defendant engaged in fraud in the inducement with regard to paragraph 40 of the AEP Agreement.

Moreover, plaintiff's allegations of fraud pertain to representations that she would be able to purchase an agency with an existing book of business at various intervals throughout the parties' relationship. Assuming these representations were made, the only evidence or assertion of actual fact to support the proposition that defendant's agents did not believe these representations when they were made is the ultimate termination of plaintiff's AEP Agreement in July of 2012 and its decision to sell the agency to someone other than plaintiff in December of 2012. Such evidence of non-performance under a contract is insufficient to demonstrate that

11

there was fraud in the inducement regarding a separate provision governing the choice of venue in the event the parties found themselves embroiled in legal conflict.

Where a valid forum select clause exists, it "should be 'given controlling weight in all but the most exceptional case." Moneygram, 65 F. App'x at 847 (quoting Stewart Org. Inc. v. Ricoh Corp., 487 U.S. 22, 33 (1988) (Kennedy, J. concurring)). In such circumstances "the party opposing enforcement of a forum selection clause has a 'heavy burden of showing not only that the balance of convenience is strongly in favor of [a different forum] but also that [resolution in the selected forum] will be so manifestly and gravely inconvenient to [it] that it will be effectively deprived of a meaningful day in court.'" Id. (quoting M/S Bremen, 407 U.S. at 19). The established precedent in this jurisdiction is in accord with these principles. See Salovaara v. Jackson National Life Ins. Co., 246 F.3d 289, 298-300 (3d Cir. 2001) (recognizing "forum selection clause" providing that "[n]o such claim shall be commenced, prosecuted or continued in any forum other than the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York" as a clear and unambiguous expression of parties' selection of an exclusive forum); Cresent International, Inc. v. Avatar Communities, Inc., 857 F.2d 943, 944 (3d Cir. 1988) (enforcing as exclusive "forum selection clause" provision in real estate contract mandating that "any litigation upon any of [the agreement's] terms ... shall be maintained" in a state or federal court in Miami, Florida).

Plaintiff has not met her burden. Plaintiff cites to the fact that Columbus, Ohio is between 150 and 200 miles from the Pittsburgh area and that many if not all of the witnesses who will provide evidence to support her fraud and age discrimination claims reside in the local area. A transfer purportedly will result in defendant's wrongful conduct resulting in an even greater

economic hardship on her. But a transfer does not impact plaintiff's ability to gather evidence in the Western District of Pennsylvania. She will have the power of this court to issue third-party subpoenas as necessary for discovery. And video depositions for discovery and testimony at trial are commonplace these days. All of defendant's agents will be subject to the presiding district court's subpoena power to the extent they remain employees of defendant, regardless of where they are located. Plaintiff will have to gather evidence from any independent agent contractor in this district regardless of where the trial will be held. And the evidence plaintiff can garner to establish she was an employee of defendant and not an independent contractor presumably is readily available to her regardless of where the lawsuit takes place.

Similarly, plaintiff will have to be away from her business and in court during any trial. The fact that she may have to travel to Columbus for a week or two to attend a trial is inconvenient. But given that she would be in this courthouse for the same amount of time mitigates the ultimate additional negative impact that a transfer will produce.

Plaintiff has merely established that the Western District of Pennsylvania is for her a more convenient forum. She has not demonstrated that the Eastern Division of United States District Court for the Southern District of Ohio would be an inconvenient forum, let alone one that is so manifestly and gravely inconvenient that it will effectively deprive plaintiff of a meaningful day in court. Thus, the private interest factors weigh in favor of the requested transfer.

Plaintiff's contention that the public interest factors displace the impact of the private interest factors is wide of the mark. Plaintiff notes that her fraud and discrimination claims are founded on state law and involve Pennsylvania's interest in regulating a foreign corporation's compliance with Pennsylvania law and the treatment of one of its citizens. These claims and interests purportedly are outside the AEP Agreement and involve an employment relationship.

13

In addition, the parties have engaged in a significant amount of discovery under the orders of this court. From plaintiff's perspective these factors should preclude the requested transfer.

Collectively, the public interest factors do not tilt the analysis in favor of displacing the parties' selected choice of forum. First, the parties have not presented any evidence to suggest that this action would be disrupted or proceed more slowly in the Eastern Division of United States District Court for the Southern District of Ohio. And while the parties have been engaging in discovery during the relatively short period of time the instant action has been pending on this court's docket, they will be able to utilize the fruits of their efforts in the transferee forum. Significant developments beyond engaging in discovery have yet to occur. Thus, given the ability to utilize the discovery and the lack of any substantive analysis of the claims and defenses, a transfer will not significantly impede the litigation or result in a waste of judicial resources. See Kirschner Brothers Oil, Inc., v. Pannill, 697 F. Supp. 804, 806 (D. Del. 1988) (judicial preparations and efforts are a public factor to be considered).

Second, choice of law and local interest considerations do not provide controlling reasons to displace all other factors. While plaintiff has presented allegations that raise an inference of invidious discrimination, it cannot be assumed that territorial bias will permeate the ultimate resolution of her claims. Defendant had a statutory right to remove the litigation to federal court based on diversity of citizenship. That right exists in part to mitigate against any bias local citizens and tribunals might harbor against citizens from another state. The action is being transferred to another federal court, not a local tribunal in Ohio. There is simply no basis to assume that the federal judge receiving the case will have some inherent bias in favor of defendant or against plaintiff. In fact, the laws of Congress assume and this court is confident that the opposite will prove to be true.

Moreover, the record does not present a basis to assume that the receiving federal judge will have difficulty in ascertaining and applying the law that is applicable to plaintiff's state law claims of fraud, discrimination, misrepresentation, infliction of emotional distress and so forth. Claims of fraud and discrimination are commonplace in federal court. And while plaintiff advances claims predicated on her asserted status of being an employee, it is clear that the parties' business relationship will have to be considered in any analysis of such claims.[1] The District Court in the Eastern Division of United States District Court for the Southern District of Ohio certainly will not be handicapped in conducting that analysis. And there is no basis to assume it will be unable to determine and apply Pennsylvania and/or Ohio law accurately and expeditiously.

The ability of the litigation to proceed in a timely manner, choice of law and local interests do not supply sound bases to undercut the analysis produced by consideration of the private interest factors. Consequently, the public factors do not militate against a transfer.

For the reasons set forth above, the forum selection clause is enforceable. Accordingly, defendant's motion to transfer to the Eastern Division of United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. § 1404(a) will be granted. An appropriate order will follow.

Date: March 30, 2016

s/David Stewart Cercone  
David Stewart Cercone  
United States District Judge

---

[1] It is undisputed that plaintiff spent 19 months in the ACB program followed by 24 months operating her scratch agency. The AEP Agreement was drafted to cover the transition between the two programs. In other words, approximately four of the parties' seven year relationship transpired under these programs.

cc: Ray F. Middleman, Esquire
Sommer L. Sheely, Esquire
Quintin F. Lindsmith, Esquire
James P. Schuck, Esquire

(*Via CM/ECF Electronic Mail*)